Court, Timothy Wilson on behalf of Plaintiff and Appellant, and my partner Robert Aron is here to address certain evidentiary matters if the need to do so arises. I would like to begin by drawing the Court's attention to what Bruce Munn did and what Bruce Munn intended to do in his conversations with Chief Dempsey. After Munn had assumed managerial responsibility for the contract with the Sheriff's Department, he determined that the Sheriff's Department had been overpaying under that contract by as much as $86,000 a year. He intended to and did bring these overpayments to the attention of Chief Dempsey so that the problem could be corrected, and it was. What Bruce Munn did not realize was that the overpayments had their origin in the billing that Chief Dempsey figured out a few sentences into the discussion. In its most fundamental expression, the question before this Court is whether the conduct of Munn is sufficiently tethered to the False Claims Act to constitute protected behavior under Government Code section 12653b. We would certainly contend that it was. And the reason is that Munn's conduct was directed to the overpayment of claims, and it was the over, and it was his bringing that attention and the accounting irregularities that were at play to the attention of Chief Dempsey that directly resulted in the return of $150,000, $55,000 of taxpayers' money to the taxpayers. The second issue that I feel is very important for the Court to appreciate is the language of the two statutes that are germane to this discussion. The defense's position relies on the following interpretation, that the phrase, disclosing information in Government Code section 12653b, contains within it a requirement of scienter. In other words, the defendant, a plaintiff seeking the protection of 12653 must intend to do something, must have a reasonably based suspicion of wrongdoing. The problem with this interpretation or this approach is that Labor Code section 1102.5 uses the exact same language, the disclosing information language. But then, in that instance, the legislature continues on, and it does so to add specifically scienter language to the requirements of Labor Code section 1102.5. In other words, the disclosing information phrase, as determined by the legislature, wasn't enough to add the requirement of scienter. It needed to specifically add it. And it did not do that within the confines of the Government Code. And what we feel is the fundamental error of the district court was grafting language from 1102.5 into Government Code section 12653b that isn't there. The third point I would like to bring to the Court's attention, in terms of the underlying findings of the district court, were the district court's contention that the only evidence that plaintiff did not have of a causal relationship between his termination and the protected activity was the timing. In other words, they both occurred at the same time. We don't believe that this is a fair recitation of the evidentiary record that we place before the Court, and it is before this Court. Sotomayor, why shouldn't there be a knowledge requirement? I'm not talking about the language, but in terms of the policy of what we're talking about here. I think that the answer to that question, Your Honor, can be found in the False Claims Act itself, in section 12655, subparagraph C, which reads, This article shall be liberally construed and applied to promote the public interest. In enacting the False Claims Act, the legislature wasn't attempting to adopt a statute that specifically regulated the conduct of employees. That wasn't the intention. It was attempting to get at another goal, which was ferreting out fraud and misuse of public funds. Right. But if an employee, in violation of his trust obligations to the employer, leaks out a lot of information without knowing that there's anything in it that indicates that there's any unethical or criminal or fraudulent behavior, and there actually isn't very much, but some, why should that person be entitled to this kind of protection that normally we think of in the rest of somebody who's really doing a pretty gutsy thing? Certainly, Your Honor. I think the answer to that question lies in the flip side of the coin, if I could use that metaphor. And that is, in this instance, Munn provided information to governmental entities that resulted in the disclosure of a false claim. That's not in dispute. The fact that he didn't appreciate this is not in dispute either. Is that what you mean by inadvertent? Did both parties agree that it's an inadvertent disclosure? Is that what you mean? What we mean by inadvertence, Justice Rhodes, is that he intended to disclose information, but he didn't appreciate that the information he disclosed would reveal a practice that was fraudulent. Okay. Because he didn't know it. But once he told the sheriff, the sheriff immediately realized, well, this sounds like double billing to me. Did he tell the sheriff as a law enforcement agency or as a client? He told the sheriff under the language of the statute as a governmental agency. Now, I think that's what I'm after is I'm not sure that 12653B fits because it just happened to be a law enforcement agency, but that wasn't the purpose here. It wasn't to turn over information to a law enforcement agency for investigation, testimony, assistance in an action to be filed. It just happens to be that the sheriff wasn't, in this case, isn't functioning as a law enforcement agency at all, just functioning as somebody who buys food. That's certainly true, Justice. So how does 12653 work then here when you have this kind of a factual situation? I would suggest that it works the following way. The Bruce Munn approached this city official for the purpose of addressing a contractual and billing irregularity. He didn't appreciate that that irregularity was there. Nothing to do with reporting wrongdoing. Nothing to do with that at all. That is absolutely correct, Your Honor. So I'm having trouble seeing how 53B works then because it seems to me to be designed to protect people who go to law enforcement agencies for law enforcement purposes. But it doesn't say that in the statute, Your Honor. Well, it seems to me to say that. The statute reads that no closing information to a government or law enforcement agency or in furtherance of a false claim including investigation, initiation of, testimony for, assistance in an action filed or to be filed under 652. And your guy was simply walking in talking about an economic event that he didn't even appreciate the consequences of it until Dempsey said, wait a minute, we're getting double billed here. Certainly, Your Honor. It doesn't seem that your client was doing any of the things contemplated by this statute. I would respectfully suggest that he was. And how I would point the Court to that attention is what the phrase that the Court read is actually two separate phrases, separated by the disjunctive or. And in the first disjunctive phrase, it simply requires Mr. Munn to have disclosed information to a government or law enforcement agency, which is what he did. And that is our contention. Now, certainly, if you were to look at the second half of the disjunctive phrase, I think that, Your Honor, would be correct in reading into that. I read it as a whole. To me, it says if you report something to the cops, you're protected. Well, he did report something to the cops. No, he was just discussing this with a client who was buying things from him. He didn't even appreciate. Well, I suppose then, I mean, when I look at this statute, Your Honor, and the overall effect that it's designed to have, certainly the legislature appreciated that fraud on the public treasury is going to take place largely through the vendors that the agency uses. The governmental agencies do spend money largely through contractors. And this is what's happening here. So in that capacity, Mr. Munn is approaching – it is true – he is approaching someone with whom he has a business relationship, but he's also approaching someone through whom the city pays money, which is the underlying intent of the false claims act to get at claims, to get at instances when the city is spending money. This is generally called a whistleblowing statute, right? I think that would be a fair characterization, Your Honor. What's wrong with what Judge Patel said? Can a person blow a whistle when he didn't know a whistle existed, and when he didn't know, he might be blowing it? What's wrong with that statement? Well, I think that, as I've – we've stated in our brief that the function of metaphor is to aid analysis and not dictate it. And so when we look to what is and is not protected under the statute, what I would suggest, Your Honor, is that we don't look to metaphor, but we look to the language that the legislature gave us. But how can he be a whistleblower when he doesn't know he's blowing a whistle? Then we get back to my point, I think, Your Honor, which is that I don't think that in that instance that metaphor probably serves us very well. The language of the statute is what should drive the analysis. If it's the purpose of it or anything else. I'm sorry, Your Honor? Not the purpose of the statute. That's irrelevant? No, absolutely not, Your Honor. And I would say that's our problem here. Okay. Well, my response, Your Honor, would be that the – I don't think it can be disputed that the conduct of Mr. Munn directly resulted in the refund of $155,000. I mean, I don't think that's in dispute. So his conduct directly resulted in effectuating the broad purpose of the False Claims Act. I think the only question before the Court is, did he need to intend that effect? He'd be protected, yes. Okay. I think we understand. Okay. I'd like to reserve the rest of my time, Your Honor. May it please the Court, William Warrick on behalf of Aramark Correctional Services, Inc. Bruce Munn was an Atwill employee who was fired for falsifying inventory information. He admitted that he violated Aramark's business conduct policy. There's not a scintilla of evidence which links the termination to this discussion of billing practices that he had with the sheriff. Well, isn't the timing kind of close? The timing is kind of close, Your Honor, but there are – it is the law. The timing is not enough, and the timing is close in this instance because the two things occurred close in time, and I will – I don't think I need, given the Court's questions on the statutory issue, to argue that further. I think there is – Well, we ask a lot of questions. It doesn't necessarily mean we believe what the premises of the insinuations are. Well, then let me go to the reasons. There are two independent reasons why Government Code Section 12653 does not apply in this case. In the first place, intent is required under the statute. It's a California court of appeal case that's on point, Levine v. Weiss, that holds that a reasonably-based suspicion of a false claim is required. The only way of harmonizing – Was that beholding or was that dicta? It was a finding of the Court on its way to a decision. It wasn't directly necessary for the Court to reach, but it did. But it's dicta. It is. It is a – it was dicta. Thank you. And – but it was the same finding, I think, as Judge Patel. It's the only way of harmonizing Labor Code Section 1102.5b, because otherwise, as Judge Patel found, you just do an end run on that statute, which requires a reasonably-based decision. It is a false claims – it is a whistle – part of the whistleblower statute. There's no discussion in the legislative history which suggests that the legislature was trying to radically change the way that false claims matters would be brought. And to Justice Schroeder's initial question, the purpose of this Act is not helped by the interpretation which the – Mr. Munn would provide. The purpose of it is to encourage an employee with knowledge of a false claim to come forward and then to discourage an employer from stopping that person from doing it. And that has nothing to do with what happened in this case, where Mr. Munn did not know that the billing practice that he was discussing was in any way improper, and he continued to hold that belief for a couple of – for months after the initial discussion. I want to go to the causation question, Justice Brooks, that you described. I think it is undisputed that the chain of events to Mr. Munn's termination was from the food service manager in San Bruno to the national sales manager, Rick Burns, who went to the new regional vice president, Mike Hudecek, who ordered an investigation by Rich Siska in which Mr. Munn admitted that he falsified inventory information and violated the business conduct policy. And he was terminated as a result of that. There is no direct evidence of any connection between that and Mr. – and the discussion of the billing practices. And there's no other evidence other than speculation as to any sort of a link. And they – Mr. Munn makes two – asked two questions about that. One is, why did it happen so close in time? Well, it happened so close in time because these two events occurred so close in time. And then he says, well, why weren't others disciplined besides me? Well, the three people who had knowledge of this, two of them were already gone, the old regional vice president and the manager for Mr. Munn, Singh Nindra, and the third guy, Saroj Mistry, had been transferred to another line of business. So they were out of the chain altogether. What is not true is the suggestion in Mr. Munn's brief that the auditor for Aramark, Dan Sertsuras, or Rich Siska, knew about this prior to August of 2001. That was going to be a question I was going to ask. Is there a genuine issue of material fact on that? Or I'm going to say it's just absolutely open and closed, it's plain. It's absolutely open and closed. And if you would look at the Sertsuras testimony, it's in the record at 651 and then 654-664. What Mr. Sertsuras was doing was determining whether variances existed in written documentation when he did his audit in April. And he determined that there were variances between what Mr. Munn was reporting and the written documentation. It was not his job and he did not go dig into the question of why those variances were occurring. That's not what the auditor's function was. There's no evidence that Mr. Munn told Mr. Sertsuras what he was up to. There's no evidence that Mr. Sertsuras reported that to Mr. Siska. What he reported to Mr. Siska was that there were variances occurring between what Mr. Munn was reporting and what the written documentation showed. For example, 656 talking about the 5,868 pounds of sausage topping. This is where you say he explains what he was doing and you can't tell what the other side is talking about without doing more testing. You couldn't know whether it was right or wrong. Is that what you're referring to? It is in that evidence and I think you have to read it. What Mr. Sertsuras said was first when he was shown those pieces of paper, he didn't have a recollection. But what he found there was simply that there were variances and he couldn't do nothing more with them. But he could not make a determination and Mr. Munn didn't tell him that the actual sausage wasn't there or that he had created a false billing procedure in order to do it. But that's exactly the testimony that you need to look at, Your Honor, to make that determination and Sertsuras didn't know it, couldn't have told it to Siska. Siska discovered it and Mr. Siska's deposition also makes that clear. And then finally, there's one stray issue that nobody's addressed which is the unclean hands issue which I'll address briefly. This is a defense with broad applicability in California for both legal and equitable claims. The Camp case did apply it, the McKinnon case did apply it. Those cases I think are clear and we meet the tests that are laid out in Blaine. This is a cause of action determination which is affected by Munn's conduct. That conduct here, the falsification of inventory, goes to the very heart of the employment relationship and the purpose of the whistleblower statute is not undercut by applying the unclean hands doctrine in this case. Thank you very much. Thank you. Why is there a genuine issue of fact on your claim that the company knew about this double billing practice and didn't do anything about it until the other problem blew up? There are several answers to that question, Your Honor, two of which are the most apparent. The first is that this individual, Tony Washington, who was acting as the food service director for the jail at issue, complained to the two district managers over and over and over again and then when he didn't get any satisfactory results, he went above their head to the regional Mr. Hudachek, who ultimately oversaw the investigation. So the idea behind this billing practice that Aramark now finds objectionable is very analogous, if you will, to the Calarasi decision where plaintiff in that instance engaged in a certain line of conduct that that was characterized in the exact same fashion and as the court in that instance pointed out, here it went on from between January and approximately mid-July when they finally launched their investigation and prior to mid-July, that same conduct was either personally approved of by the district manager, we've got evidence in the record to that effect, or was simply ignored when presented to Tony Chung, the regional vice president, or the replacement district vice manager, district manager, Singh Nindra. So all of these people ignored this conduct before Mr. Munn engaged in what we characterize as protected activity. And as soon as the protected activity bore fruit, they were the decision-makers? Yes, they were, Your Honor. I would also point out What do you get out of Soturis' testimony, though? I just read it for the second time and I don't see that establishes very much in your favor. Certainly, Your Honor. I'd be more than happy to address that. I would in particular address the Court's attention to a couple of points in the evidentiary record. The first would be that look at what Soturis was charged with. He was charged with going out to this site and looking to see what was there. What's key here is this, Your Honor. The way that they ran the billing practices at the San Francisco jail was that they didn't record a physical inventory on the site. It was there. They just didn't record it on the books. What Munn did was he created a physical inventory on the book so that he could appropriately carry this balance for the sheriff's department. What's key here is that in order for him to do that, he had to write that down. He had to put that in a document. And it is that recordation which the defendant characterizes as the falsification of records. One of those examples of a document can be found at ER — well, at ER 661, 663. Soturis testified that he reviewed a document that is known as the inventory analysis. That's the document that Munn altered. That document is found at ER 0687-0688. That's the inventory analysis that is the byproduct of Munn's tinkering, if you will. Wasn't it phony? It — I wouldn't characterize it as phony, Your Honor. It — it — what he did was he reflected a balance in order to accurately reflect the amount of money that the sheriff's department owed Aramark. So it wasn't inaccurate to the degree that it represented what the city owed. It was inaccurate to the degree that it reflected a physical inventory that they didn't normally track. And that's what Soturis was there to do. Isn't that exactly what Ponzi did? I'm — I'm sorry, Your Honor? Ponzi. The Ponzi scam, that's exactly what he did. He said there was a lot of vegetable oil in the tanks, and there wasn't any there. Isn't that the same thing? I'm — I'm not familiar with that, Your Honor. Okay. But I — I think the point here is that no one has accused Bruce Munn of attempting to defraud anyone. It's not a question of defrauding. They took issue with his method of recording the balance that the city owed Aramark. Okay. So to get back to Justice Trott's question, Soturis, Your Honor, reviewed these specific documents. He went out to the site. He looked at the inventory. He noted the variances that appear on these inventory analyses, the very ones in question. And then he reported his findings to Sysco. So certainly, one inference to be drawn from the evidence is, as Mr. Orrick articulates, which is he didn't catch it. He didn't notice it. But certainly — Says you couldn't know whether it was wrong or not. That's one inference to be drawn from it. But we — That's not an inference. That's what he said. With all due respect to his representations, we are suspicious of them. I mean, and we believe that we have evidentiary reasons to be suspicious of them. And the reasons, Your Honor, would be that when you look at the inventory analysis, it stands out like a sore thumb. It doesn't comport with what is normally there. I would just like to close by reiterating what I believe are five pieces of evidence that we have to establish a causal relationship between the termination and what we would characterize as the protected activity. First, there was knowledge on the part of Aramark that Munn had engaged in this activity. Two, their treatment of him, their negative treatment of him, began immediately after that knowledge was the timing issue. Three, there was a before-and-after treatment that's spoken about in the court by — in the Calarasi decision. Munn engaged in a line of conduct that, before he engaged in protected activity, wasn't objected to, even by the highest levels of management, but it was afterwards. Four, there's disparate treatment. And I would specifically direct the Court to ER-0727, where Mr. Kudachek is asked, did you investigate anyone else for not following up on the problems that were present with Mr. Munn's accounting? No. And then, five, we've cited the failure to pay the vested vacation pay in a manner that was utterly inconsistent with our normal practices. My biggest problem with your argument, and I'd like to have you say it again so I understand it was your — I don't see how he's blowing a whistle. I really don't. How he's — the very definition of a whistleblower, how he can be a whistleblower when he doesn't know what he's doing is blowing a whistle. I don't understand that, and you're going to have to help me with that. Okay. Your Honor, I guess the only thing I can analogize it to is if, let's say, for instance, Chief Dempsey had had some suspicion that something's not right. This accounting system isn't working for me. I think something's wrong, but I'm not sure what it is. But I don't want to put the issue on the table. But Bruce Munn is a really nice guy. He's been pretty friendly with us, and he seems very honest. I'm going to call him in here, and I'm going to ask him about it. Now, in that instance, Mr. Munn wouldn't have that he was openly assisting Chief Dempsey in an effort to get at an act of fraudulent billing. He would not have intended to blow the whistle, but that would have been exactly what would have happened in that instance. And I would submit that, more or less, that's exactly what happened here. He brought an accounting problem to Chief Dempsey's attention, and at the end of that conversation, Chief Dempsey realized, you're double calling me. Thank you. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Trott, Rhoades